Our third case for the day is United States v. Andres Garcia, No. 18-1735. Ms. Gambino. Good morning, Judge Hamilton, Judge Robner, and Judge Brennan. On behalf of Mr. Garcia, there are three issues before the court. First of all, whether the district court erred in failing to ask or allow counsel to ask questions that were designed to elicit whether or not jurors had prejudices based on ethnicity, immigration status, or substance abuse. Secondly, whether there was sufficient evidence in the case to support a finding beyond the reasonable doubt that Mr. Garcia was guilty of the two crimes with which he was charged. And finally, whether the court used reliable evidence in sentencing Mr. Garcia. I'll focus my discussion on the first two of those issues. Unless the court has questions about the third, I will stand on our brief with respect to that. On that first issue, the status and identity question that got asked, Yes. did elicit a response with regard to substance abuse, and that juror later was, there was preemptory challenge exercised against that juror. How does that differ for purposes of the racial issue? Well, the way it differs, Your Honor, is that first of all, this court has said in prior cases, Lewis and Torres in particular, that asking a general catch-all question about whether a person has any reason or prejudice, like why they can't sit, a single question of that nature, is not sufficient. And that in this particular case, Mr. Garcia was in a very particular political environment. He is a young man of Mexican origin. He was presented to the jurors. His name, Andres Garcia, is, of course, of Mexican origin. He had two Spanish-speaking interpreters to help him throughout the court process because his first language was not English but Spanish. And he came into the courtroom in an environment where there was a very politically charged public debate about immigrants. There had been comments made, including from the presidents of the United States, about all Mexican immigrants being drug dealers and involved in other sorts of criminal activity. And there had been political marches in Chicago, lots of press attention to the issue. And we wanted to make sure that our jurors, if they had any strong opinions, either for or against or about people of Mexican origin or immigrants in general, would be able to express that and not be seated. Or at least we would have that information in order to be able to exercise our peremptory challenges in the proper way. I do take it that there was no reference to Mr. Garcia's national origin or immigration status at trial. That's correct, Your Honor. That's correct. There were three issues or three questions with regard to ethnicity that we sought to have asked. The first was, do you have any close friends, family members, or colleagues who are Mexican-American or Latino? The second was, do you have any opinions about immigrants that may interfere with your ability to be fair and impartial in this case? And the third was, what is your closest relationship with a person of Mexican descent? And the district court refused to answer or ask any of those questions or to allow counsel to ask any of those questions. And there seemed to be three reasons that the court gave for this, the first of which was his concern that there were people of all nationalities that would be called to sit on the jury, which really didn't address our specific concern, which was whether any of these people, irrespective of the nationalities or backgrounds of the jurors, had opinions which would be prejudicial to Mr. Garcia. The second reason that he gave was that Mr. Garcia could easily be a citizen as well as a non-citizen, and so there was no reason to ask the question. The problem with that approach to it, while in an ordinary case that may be true, when you have someone with a name like Garcia who is also using Spanish interpreters, then it leaves the impression with the jury, first of all, that this is not a native English speaker, and so the first thing that they may or may not think about is, well, he's not from here, because if he were from here, he would have been born and raised in English-speaking schools and would speak English. Was there a separate pattern instruction given with regard to the role of the interpreters? I don't recall that there was, Judge. There may have been, but I don't recall that there was. And each of these questions was not designed to embarrass or elicit anything untoward from the jurors. Counsel, I can understand why there might be some very good reasons to ask those questions, but the standard of review here is quite deferential to the district judge on the spot. That's correct. So what was it about this that made these not just a good idea, but an abuse of discretion to refuse to ask these questions? Judge, it was a combination of things. It was, first of all, the circumstances of the case, where you have a case with an individual who is Spanish-speaking. It is not common every day, although it often happens in our courts, that people testify or sit through trial with interpreters. So there is a reason to provoke questions that will go unanswered in the jury's mind. And second of all, there was the political context in which this trial occurred, and that was key. It was the politics of the time. Well, the politics of the time, and very specifically the words that were uttered by the then president and still president of the United States, saying that Mexicans come here to deal drugs and rape people and do other things. So it's from the top down, and in the newspapers all the time, this debate about who immigrants are to this country, in particular people that come from Mexico, Central America, and South America, and what they're doing here. And this has evoked and continues to evoke very strong feelings and reactions. So it was particularly key in this case that we find out whether our jurors had any of these kinds of feelings that would affect their judgment. Can I ask you to address the sufficiency of the evidence problems in the case? Certainly. The sufficiency of the evidence sort of blends in also with our problem with not having been able to wardeer the jurors with respect to their prejudice, because what we have in the evidence is a series of tape-recorded conversations. I believe there were eight of them. And those tape-recorded conversations were in Spanish, so they were not actually played for the jurors. Rather, there were agents who read the part of each of the two participants. Neither of the participants, Mr. Garcia nor Mr. Cisneros, who were the people speaking on these tapes, were called to testify or did testify. And the tapes and the English translations of those tapes were interpreted by another agent who- That was Agent Labna's opinion testimony. Right, that was his opinion testimony. So you had another layer where we have a white agent interpreting tapes that have been translated from another language, and it's based on his interpretations of those tapes that this conviction was sought and achieved. And the problem with sufficiency of the evidence was that there was little to no corroboration for these particular tapes, and the tapes themselves were not clear in terms of what was going on. At issue was an alleged drug transaction on a single day, April 17th. The investigation of the other fellows had gone on for, what, a couple of years? It had. The investigation had started in 2010, and Mr. Garcia didn't become a part of that investigation until March or April of 2012. And little to nothing of that original investigation, apart from its existence, came in at court. Can I ask you, Counsel, where are we in terms of total sentence and time already served? Mr. Garcia was released from BOP custody in October of this year, and he's now in immigration custody. Mr. Garcia had been in custody for nearly 36 months at the time that he proceeded to sentencing. Well, actually over 36 months at that time. And the judge imposed a sentence of 48 months, which he finished in October. If we were to find this evidence insufficient, then what can we do for him? Well, what we can do for him is either grant him a new trial or vacate his conviction. I said if we find the evidence was insufficient, then we set aside the conviction. That's correct. What good does that do him? What good that does him is a lot, Judge, because he, first of all, was not illegally here. He was here and had an application pending for permanent residency. He was a young man who came here at the age of 15. He had no prior criminal background at all. This was his only criminal offense. Do you see part of the DACA program? He could have been, Judge. Could have been, okay, but for this conviction. But for this conviction, but for this case, he could have been a DACA person. So the first positive result, if this case were to be set aside, would be that he would be eligible for bond and immigration court. And secondly, he would be eligible to proceed with his permanent resident application, which, of course, he hasn't been because of this case. And his family situation? His children are all United States citizen children. They all live here. He has six children, I believe, from two different relationships. His parents are here. All of his siblings are here. And all but him are either permanent residents or citizens at this point. And because of the age at which he was brought here, he doesn't have a network of contacts and family members back in Mexico. So it would be a terrific hardship both for him and all of his kids. And where is he in immigration custody? Your Honor, the last that I heard from him, he was in Texas. Sure. Is there any possibility that he's going to be removed from the United States before this court acts? It's unlikely, Judge. He has immigration representation, and I believe that they are able to ‑‑ I mean that the case isn't technically final until this court makes its decision. And so it's unlikely that he would be deported before the case is decided. Okay. Thank you. Returning to the issue of sufficiency of the evidence, to finish my answer to your question, there was a videotape from a poll camera that was admitted, but the agent himself admitted that you couldn't distinguish the features of the individuals who were on the poll camera. So the sum total of what actually happened on that day is dependent on the translated phone call and this video camera that he was present in a particular place. But there doesn't seem to be any question that it was Mr. Garcia who went into Cisneros' residence, is there? Well, Judge, from the agent's point of view, no, there wasn't. But they stopped him after he left, and there's no money, no drugs, no nothing. Yes, that was on a separate day. Oh, sorry. There were two separate days. On the day of the actual transaction, there was no stop, and there was no follow-up to determine what actually had happened. They believed, based on the phone calls that happened on that day, that a transaction happened, but they had nothing to corroborate that. Well, there are, as you know, there were references to Mr. Garcia on the tapes, and to the possibility that Mr. Cisneros could cook whatever it is they were talking about, isn't there? Yes, Judge. In the days following the alleged transaction, there was a conversation back and forth that the agent interpreted as being that the cocaine that Mr. Cisneros had allegedly received was bad, and that he was going to return it. And so based on that conversation, they followed Mr. Garcia on another day, which was two days later, and they believed, based on their interpretation of the conversations, that when they stopped him, he would have the cocaine in his car. It was at that point where they stopped him, and it turned out that they had either misinterpreted or they were flat wrong or things didn't go the way were planned, because Mr. Garcia had nothing in his car. He had two phones in his car, which he volunteered to let the agents search. He also volunteered to let the agents search his home, and they found nothing in the search of his person, his car, or his home, that would substantiate their belief that he was involved in drug trafficking. So what we were left with at trial was the translated tape recordings and the other agents' interpretation of those recordings. So while the government has been critical of this approach and uses CEJAS to compare it to, I would note or point out to the court that in CEJAS, there was an actual participant who testified against the defendant, and they had found a large quantity of money in the truck of the people that were on trial, which was explained by the participant that was cooperating. In this case, we didn't have any of that. Anything further? No, Your Honor. We would ask that Mr. Garcia's case trial. We'll hear from the government. Mr. Venditti. Thank you. May it please the Court. District courts enjoy considerable discretion in managing jury selection and voir dire, and in this case there was no abuse of discretion by the district court in declining to ask the questions proposed by the defendant. Voir direing jurors specifically related to possible bias along lines of ethnicity or immigration status is not required by the Constitution or by the Supreme Court's supervisory rule unless that subject is inextricably bound up with the facts and circumstances of the case that's on trial, and this is not a case that was like that. This case was about a drug deal. It had nothing to do with anyone's ethnicity or immigration status, and these were simply not issues that were of any concern to the jurors deciding the case. Mr. Venditti, your office tries a lot of criminal cases downstairs in this building. How unusual was this approach to voir dire? This was Judge Duryegi, right? Correct. At the trial. So how unusual was this approach to this kind of question? Do you know? Offhand, I couldn't really say, Judge. I couldn't canvass. I have to say, if I'd been presiding, I would have asked a lot more questions along these lines, and I appreciate the abuse of discretion standard here, but I'm just trying to get some sense of actual practices within this district. I'm afraid, Your Honor, that I couldn't tell you the answer to that. Mr. Venditti, you didn't object to the questions, did you? I don't believe that there was an objection from the government to these questions. This was an issue that was decided between the district court and the defendant. And this analysis with regard to the questions happens about five days prior to the actual voir dire, correct? As I recall, it was pretrial that it was decided. I think it's November 8th versus November 13th. And is it the case that the judge rejects questions from both parties? I don't believe that the government submitted any proposed voir dire questions. I'm not entirely sure, but I don't think that there were any proposed voir dire questions that the government submitted. And I take it there's nothing in the record concerning the racial composition of the jury, of the exercise of cause challenges, or the exercise of preemptory challenges that you're aware of. There's some information from the record about, and this is laid out in the government's brief, that the defendant exercised, I believe, six out of the ten preemptory challenges on the first panel of 14 jurors, and the other four on the second panel. So he was out of preemptories by the time they got to the third panel, and it was after the third panel that the jury was selected. The defendant did not ask for more preemptory challenges, and I believe all of his cause challenges on that third panel were granted by the district court. Were granted? Were granted by the district court. As far as the racial or ethnic composition of the jury, all I can say is that it appears to me that there are four surnames on the jury that was seated that I would say were Hispanic. But again, I'm not sure what all you can make of that. One of the jurors, one of the surnames that I would regard as a Hispanic surname is combined with a given name of Maureen. So what that says about the ethnicity of this juror, I really don't know. And the jury that deliberated was 13 jurors, is that correct? Fourteen were selected, 12 jurors and two alternates. And I think it is at record transcript 209 and 210 where the judge has the clerk read the names of the 14 selected jurors. And the first 12 are the jurors that decided the case, and the last two are the alternates. And it is in that group of the first 12 that, to my eye, there are four Hispanic names. I may have it incorrect. I believe the jury verdict form itself might have 13 signatures, including the four person. But I might have read the record wrong. I couldn't say, Judge. I didn't look at that. With regard to the sufficiency of the evidence, the verdict was supported by sufficient evidence in this case. A properly instructed jury considered properly admitted evidence and heard all of the arguments that are being made here today about what to make of that evidence, and that jury convicted. There's no procedural irregularity in the way that this came about. And there is no basis on which to regard that verdict as unreliable. I'm trying to figure out, Mr. Bindi, if we've affirmed convictions on an equally thin basis in drug cases. We've got no drugs, no money. We've got code interpreted by not even the case agent, but somebody from outside the case who seems to have had the jury's job delegated to him to interpret those phone conversations and conclude it must have been a kilo of cocaine. How is this anything other than speculative, with respect to Mr. Garcia? With respect to Mr. Garcia, Agent Labneau's testimony is based on considerable experience, which was put on the record for the jury to consider his experience in investigating narcotics prosecutions. It may well be inspired inferences, but 2-4, concluding that that must have been $24,000 and must have been, therefore, a reference to a kilo of cocaine, seems awfully speculative to me in terms of proving beyond a reasonable doubt. Maybe Garcia's guilty, but did you prove it, is the question. Well, again, that was a question for the jury, and they did hear all of these arguments made by the defendant with what to make of this evidence. Well, let me try to restate my question then. In terms of our case law or case law from other circuits, are there convictions based on equally thin evidence? And Cejas, which is what you lead with, has way more evidence against him than this. Well, that's the case that we put in the brief as a comparable. I think, well, if you see way more evidence than that. What I see in Cejas is the police see Cejas under surveillance, put something into a box in a truck. They pull him over immediately. They discover money and a gun in the box, and you've got a co-conspirator testifying in the trial that Cejas, in fact, holded drugs. That's sufficient evidence, obviously. That is sufficient evidence. Here? Well, here, Your Honor, you have the evidence of the defendants. The phone conversations are the lion's share of the government's evidence in this case. No question about it. But those phone conversations. They're suspicious, no doubt about it. Well, there obviously is a conversation between two people who are trying very hard not to say exactly what they mean for fear that someone is listening in. And that's common in drug cases. And Agent Labneau has seen it many times, and we've all seen it many times. And Agent Labneau's interpretation of those conversations, the defendant argued that it was speculative to the jury. But it makes sense. It's a possibility. It's a good possibility.  Without Labneau's opinion, then it would be up to the parties to argue to the jury about what the meaning of this conversation was. It's hard to see how a jury could make sense out of these conversations without help from expert testimony. And there was no objection to the relevance of, or there was an objection to relevance,  and that was put before the jury, and they considered it. The argument was made that it was speculative, and they rejected that. Shifting to the amount of the cocaine at issue, is Labneau's testimony, does he get precise enough to say, 2-4 is 24,000. An inference from the conversations is that this cocaine has already been cut. At this time in the Chicago area, an uncut kilo would be 27,000 to 29,000. A cut kilo would be 24,000. Does he get into any ranges like that? Yes, he does. There is testimony regarding some of the conversations the day after the transaction took place where there are references to numbers, and Labneau interprets those to mean, I think, higher percentages. This is laid out in the government's brief. I'm not sure exactly what page, but he's talking about higher percentages and higher prices for a kilo given cocaine of sufficiently high quality. And he did testify that the number 2-4 was at the low end of the price range in the market at the time for a kilogram of cocaine. So the testimony in front of the jury was to the effect that, yeah, 2-4, 24,000, that's a kilo, but it's at the low end of the price scale for a kilogram of higher quality cocaine you could expect to pay more for, and this was part of Labneau's testimony. As far as in terms of the quantity for purposes of the drug quantity calculation at sentencing, again, this was really the primary subject on which Labneau was cross-examined, was the meaning of 2-4 and whether it was $24,000, which would be the price of a kilogram, or $2,400, which would be the price of something less. And his testimony was that in the context of this conversation and everything else that went on during it, it was unlikely that it was anything other than 24,000 in reference to a kilo. There was no testimony about what the defendant's argument is that they could have been talking about ounces instead of kilos. There was no evidence about what the going rate of an ounce of cocaine was in this market at that time. So basically what the district court had before the sentencing hearing was some evidence that 2-4 meant 24,000 meant a kilo, and no evidence that it meant anything else. And based on that, the district court made the finding. And so for these reasons, we request that this court affirm the judgment. Thank you. Thank you, Mr. Bindy. Rebuttal, Ms. Gambino. Your Honor, in answer to your first question, whether this was an unusual approach on behalf of Judge Giughi, in my experience, I have proposed that these sorts of questions be asked in other cases. And other judges have agreed to ask those questions, or some variation on those questions, in order to get at the issue, which is whether anybody is harboring any prejudice. That would be difficult. With respect to the- Have you all ever having been refused those instructions by any other judge? I have had another judge refuse to ask them as written, but replace them with his own version. But nobody other than Judge Deryagian has outright refused to ask those questions, or questions similar to them. And that's just my experience, Judge. Yeah, I know. I don't purport to speak for anybody else. With respect to the surnames on the members of the jury, the question is not what their ethnicity was, but what they thought about other people's ethnicity and what their experience was. And most particularly in the question of immigrants, which naturally would have come to their minds under the circumstances of having the interpreters present. Because even people of Mexican origin may have strong feelings against immigrants coming, depending on the way they came. And given the context of the public debate, the question, the concern, was no matter what the origin of the jurors, what did they think about the origin or possible origin of the defendant? And with respect to the 2-4 issue, Agent Labneau conceded on the stand that 2-4 could have, in drug parlance, also have stood for 2,400, 24. It could have stood for quantities of dollars as well as quantities of drugs. And it was his belief in this particular case that it was 24,000 and that it was a kilo. At sentencing, we did present other evidence, other evidence of other quantities of drugs that were exchanged during the course of the conspiracy. And most of them were closer in keeping with the ounce quantity than the kilo quantity. With respect to Mr. Cisneros especially. So all of those really go to the speculative nature of Agent Labneau's testimony. And it was without basis or corroboration in the court at the time of trial. Ms. Gambino, when you are arguing the November 8th motion with regard to the additional board year questions, do you have or not have the jury list? We do not have. That comes to you on the 13th or the 14th? That comes to us on the day, yes, the day of jury selection. Thank you. Thank you. Thanks to both counsel. The case will be taken under advisement.